TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
THEODORE MAYA (SBN 223242)
*tmaya@ahdootwolfson.com*
DEBORAH DE VILLA (SBN 312564)
*ddevilla@ahdootwolfson.com*
SARPER UNAL (SBN 341739)
*sunal@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  310.474.9111
Facsimile:  310.474.8585

*Attorneys for Plaintiff and the Proposed Classes*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KENNETH KRUGER, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>INMARKET MEDIA, LLC,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kenneth Kruger ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to himself, and on information and belief as to all other matters, by and through undersigned counsel, brings this Class Action Complaint against Defendant InMarket Media, LLC. ("InMarket" or "Defendant").

## NATURE OF THE ACTION

1. Plaintiff brings this class action on behalf of himself and all other individuals ("Class members") who had their sensitive personal information—including but not limited to historical and real-time geolocation data ("Personal Information")—collected, stored, shared, and/or used without their informed consent by InMarket, including through InMarket-owned and -operated applications, or

through the InMarket Software Development Kit ("SDK") that is embedded into many third-party applications.

2.     InMarket is a data aggregator company and digital marketing platform.

3.     For most of its company life, InMarket's business grew through its appeal to mobile application developers, brands, and retailers.

4.     For mobile applications, InMarket's SDK made targeted audiences available to advertisers, drawing greater ad revenue and better returns on investment.  The incorporation of the InMarket SDK into third-party apps allowed InMarket to expand its historic and real-time location database.

5.     For brands, InMarket offered access to or use of its vast historic and real-time location data to better target ads and reach desired audiences.

6.     For retailers, InMarket offered targeted advertising of store items based on a consumer's precise location which could be as granular as the store aisle they were browsing. This allowed retailers to highlight items based on a consumer's trajectory and potential intent.

7.     Since 2018, InMarket has prioritized the expansion of its consumer reach and location database through both acquisitions of mobile apps and by also convincing third-party apps to embed InMarket's spyware SDK into their platforms. While pursuing this grand expansion of its database, InMarket failed to take necessary measures to ensure that third-party apps incorporating Defendant's SDK made the appropriate disclosures and obtained informed consent from consumers regarding InMarket's use of their data.

8.     As a result of Defendant's conduct, Plaintiff's and Class members' privacy has been invaded, Personal Information collected, stored, shared, used, and/or monetized without their consent.

## PARTIES

9.     Plaintiff Kenneth Kruger is an adult citizen of the state of California and resides in Palo Alto, California.

10.     Plaintiff downloaded and used a third-party mobile application containing an InMarket SDK embedded in its platform. This InMarket SDK collected and transmitted Plaintiff's Personal

CLASS ACTION COMPLAINT

1    Information, including geolocation data, to InMarket. Plaintiff had no knowledge of and never consented

2    to the collection, storage, use, and/or sharing of his data by InMarket or any another third party.

3         11.     Defendant InMarket Media, LLC is a Delaware corporation with its principal place of

4    business located at 111 Congress Avenue, Suite 500, Austin, Texas 78701.

5    **JURISDICTION AND VENUE**

6         12.     This Court has subject matter jurisdiction over this action pursuant to the Class Action

7    Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of

8    interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00) and is a class action

9    in which one or more Class members are citizens of states different from Defendant.

10         13.     The Court has personal jurisdiction over Defendant because InMarket conducts

11    significant business in California, and Defendant otherwise has sufficient minimum contacts with and

12    intentionally avails itself of the markets in California. Plaintiff is domiciled and suffered his primary

13    injury in this district.

14         14.     Venue properly lies in this judicial district because, *inter alia,* InMarket transacts

15    substantial business and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this

16    judicial district.

17    **FACTUAL ALLEGATIONS**

18    **A.**     **InMarket Collects and Monetizes Historic and Real-Time Location Data**

19         **Aggregated from Mobile Applications**

20         15.     InMarket is a digital marketing platform and data aggregator. It collects consumer

21    location data through applications InMarket owns and its software development kit (the "InMarket

22    SDK") incorporated into third-party mobile applications ("apps").

23         16.     InMarket obtains large swaths of personal data on consumers—including information

24    about their movements over time tracked on their mobile devices, as well as their purchasing history,

25    demographic data, and socioeconomic backgrounds—and keeps that information for up to five years.

26         17.     InMarket uses the consumer data to facilitate targeted advertising to consumers on their

27    mobile devices for the company's clients, which include brands and advertising agencies.

28

18.     InMarket displays this advertising itself using the InMarket SDK, and also categorizes consumers into groups called "advertising audiences" that enable its clients to target consumers more precisely on third-party advertising platforms.

19.     Defendant fails to notify consumers that their location data will be used for targeted advertising and fails to verify that apps incorporating the InMarket SDK have notified consumers of such use.

20.     InMarket SDK is a collection of development tools that can be incorporated into mobile applications to obtain the historic and real-time location of the applications' users.

21.     Defendant has incorporated the InMarket SDK into the mobile applications that it owns and operates (the "InMarket Apps"). InMarket Apps consist of applications InMarket created soon after the company's formation and the mobile applications it acquired as part of a campaign to expand its reach and location database. The former applications include CheckPoints, which offers shopping rewards for completing tasks such as watching videos and taking online quizzes, and ListEase, which helps consumers create shopping lists. These applications have been downloaded onto over 30 million unique devices since 2017.

22.     Since 2010, InMarket has offered the CheckPoints app on both the iOS and Android platforms. InMarket's CheckPoints app is marketed as a "rewards app," and promises users "easy money—earn as you shop." It tells consumers to "join the millions earning free gift cards and more every day." Users of the app collect points by performing various tasks (checking into retail locations, watching videos, scanning certain products while in store, taking surveys and quizzes), and then exchange those points for rewards, such as gift cards. The app is free to download and includes in-app advertising.

23.     Since 2012, InMarket has offered the ListEase app on both the iOS and Android platforms. The ListEase app markets itself as an electronic shopping list app. The app is free to download and includes in-app advertising.

24.     The consent screens used for both the CheckPoints and ListEase apps tell consumers that their location will be used for the app's functionality (earning points and keeping lists), which are

CLASS ACTION COMPLAINT

misleading half-truths. Thus, users are choosing to share their location with these apps for specific purposes completely unrelated to InMarket's larger advertising-related business.

25.    At no point during the consent process for either the CheckPoints or ListEase Apps did InMarket also disclose that it was collecting users' precise location, often multiple times per hour, along with data collected from multiple other sources—including through other apps using the InMarket SDK—to build extensive profiles on users to be used to precisely target them with advertising.

26.    Although InMarket discloses in its privacy policy that it uses consumer data for targeted advertising, its consent screen does not link to the privacy policy language, and the misleading prompts do not inform consumers of the apps' data collection and use practices.

27.    Representations related to use of consumers' location information for advertising and tracking are material to consumers.

28.    In 2019, InMarket launched a campaign of mobile application acquisitions to expand its consumer reach and location database. To that end, in August 2019, InMarket announced the acquisition of Thinknear, a location-based mobile marketing platform. InMarket's press release on the acquisition described the benefit of the partnership with the following words:

> The acquisition will allow Thinknear's clients to engage at the moment of truth through InMarket's 50 million Comscore-verified smartphone integrations. These direct connections enable brands to identify and engage consumers during multiple touchpoints of the purchase journey, including as they walk into any location in the US. InMarket's Moments technology delivers real-time, premium engagements with customers at precise locations during consideration and decision. InMarket clients will gain access to Thinknear's place-based targeting and Geotype technology, which create valuable high-performing profiles around ideal customers based on location behavior. Thinknear's Geolink is an advanced self-serve dashboard that will give InMarket clients one of their most requested features-- the hands-on ability to launch campaigns themselves from trading desks.[1]

29.    In September 2020, InMarket announced the acquisition of assets from NinthDecimal, another location-based attribution and analytics company. The press release noted that "[m]arketers will now have access to an omnichannel platform that includes location and transactional audiences;

---

[1] https://www.prnewswire.com/news-releases/inmarket-to-acquire-thinknear-expand-location-based-marketing-solutions-300899051.html (last accessed Feb 5, 2024).

CLASS ACTION COMPLAINT

GeoLink self-service marketing with real-time Moments; Location Conversion Index (LCI) attribution; and a robust set of advanced analytics — all via one partner."[2]

30.    In December 2020, InMarket completed the acquisition of Key Ring, the shopper loyalty app from Vericast.

31.    InMarket advertised the acquisition as a further step to "empower brands to reach highly engaged, opted-in shoppers in real-time, while closing the loop on measuring campaign effectiveness," as well as "underscore[] the growing importance of first party data from opted-in consumers, and the value of real-time contextual advertising."[3]

32.    In June 2021, InMarket acquired Out of Milk, a shopping list app with millions of downloads. InMarket announced this acquisition as a move to "further bolster its industry-leading suite of owned-and-operated apps, including List Ease CheckPoints, and Key Ring that span the journey as shoppers plan, save and organize. These unique properties are part of InMarket's competitive advantage reaching shoppers across all stores and categories. The apps empower brands to reach a variety of highly engaged, opted-in shoppers in real-time."[4] Todd Dipaola, CEO and Founder of InMarket, highlighted the key function of this and the preceding acquisitions: to "scale InMarket" and its breadth of location data.

33.    Defendant also makes the InMarket SDK available to third party app developers, and it has been incorporated into more than 300 such apps, which have been installed on over 390 million unique devices since 2017. App developers are incentivized to incorporate the InMarket SDK into their app because they receive a portion of InMarket's advertising revenue from each ad served through their apps.

34.    One of the primary functions of the InMarket SDK is to transmit a consumer's precise location back to Defendant.

---

[2] https://www.prnewswire.com/news-releases/inmarket-acquires-assets-from-ninthdecimal-creating-the-definitive-leader-in-real-time-data-driven-marketing-301126032.html (last accessed Feb 5, 2024)

[3] https://www.prnewswire.com/news-releases/inmarket-acquires-key-ring-expanding-its-data-driven-marketing-and-insights-suite-301190647.html (last accessed Feb 5, 2024)

[4] https://www.prnewswire.com/news-releases/inmarket-acquires-out-of-milk-to-bolster-real-time-contextual-advertising-from-planning-to-purchase-301317186.html (last accessed Feb 5, 2024)

35.     Apps that incorporate the InMarket SDK request access to the location data generated by a mobile device's operating system. If the user allows access, the InMarket SDK receives the device's precise latitude and longitude, along with a timestamp and a unique mobile device identifier, as often as the mobile device's operating system provides it— ranging from almost no collection when the device is idle, to every few seconds when the device is actively moving—and transmits it directly to Defendant's servers.

36.     From 2016 to the present, about 100 million unique devices sent Defendant location data *each year*.

37.     In addition to not disclosing its data collection practices in its proprietary apps, InMarket also does little to verify that third-party apps incorporating its SDK obtain informed consumer consent before granting InMarket access to their sensitive location data. InMarket additionally neither collects nor retains records of the disclosures that third-party apps incorporating the InMarket SDK provide consumers before accessing their location data.

38.     In fact, InMarket does not require the third-party apps that incorporate its SDK to obtain informed consumer consent. Aside from general guidelines requiring the app developers to "comply with all applicable laws," and to maintain a "privacy policy in line with legal requirements," InMarket's contract with the developers requires nothing more from them in terms of privacy.

39.     Even if these third-party app developers wanted to provide adequate disclosure to their users about InMarket's use of their location data, InMarket does not provide the developers with sufficient information to provide that notice. Specifically, InMarket's contract with third-party app developers merely states that InMarket will serve ads on the developer's apps in return for developers passing user information to InMarket, including precise location and advertising identifiers.

40.     InMarket does not disclose that information collected from these third-party users will be supplemented and cross-referenced with purchased data and analyzed to draw inferences about those users for marketing purposes.

41.     InMarket therefore does not know whether users of hundreds of third-party apps that incorporate the InMarket SDK were informed that their data would be collected and used for targeted advertising or consented to such collection and use of their location data. In fact, the third-party apps'

CLASS ACTION COMPLAINT

disclosures are, in some cases, misleading; for instance, leading a consumer to believe that his or her location data will be used for one purpose (such as obtaining discounts at certain retailers), when in fact the location data is being used by InMarket as alleged herein.

42.     Because InMarket readily combined the location data of users into its databases and systems without confirming user consent, InMarket obtained and used that data without informed user consent, resulting in consumer injury.

**B.     InMarket Creates Specific Audience Segments for Targeted Advertising Based on Sensitive Location Data**

43.     Through the InMarket SDK, Defendant collects sensitive information from consumers, including where they live, where they work, where they worship, where their children go to school or obtain child care, where they receive medical treatment (potentially revealing the existence of medical conditions), where they go to rallies, demonstrations, or protests (potentially revealing their political affiliations), and any other information that can be gleaned from tracking a person's day-to-day movements. All of the above information is collected along with several identifiers including a unique mobile device identifier.

44.     Defendant processes the location data it collects so that it can determine how long a particular mobile device (and therefore a particular consumer) stays at a given location. All data collected through the SDK is processed together, meaning that InMarket may use data from multiple apps to determine when a particular consumer arrived at a particular location, how long she stayed there, and when she left.

45.     InMarket cross-references consumers' location histories with advertising-related points of interest to identify consumers who have visited those locations.

46.     InMarket sorts consumers, based on their visits to points of interest, into audience segments to which advertising can be targeted.

47.     InMarket has created or maintains almost two thousand distinct advertising audience segments. For example, an InMarket brand client can target shoppers who are likely to be low-income millennials; well-off suburban moms; parents of preschoolers, high-school students, or kids who are home-schooled; Christian church goers; convenience-sensitive or price-sensitive; single parents or

CLASS ACTION COMPLAINT

empty-nesters; affluent savers or blue collar workers; "healthy and wealthy" or "wealthy and not healthy," to name only a selection of the categories InMarket offers or has offered to its brand clients.

48.    InMarket classifies audiences based on both past behavior and predictions it makes about consumers based on that behavior. For example, if a consumer's past location data shows that she has visited a car dealership, InMarket can combine that information with the consumer's attributes purchased from other sources (age, income, family structure, education level), and can potentially predict that she may be in the market for a certain type of vehicle.

49.    The InMarket SDK displays the ads and determines which ads appear in which apps incorporating the SDK. InMarket additionally offers advertisers a product that sends push notifications based on a consumer's location and "geofencing" (i.e., a virtual fence around a particular point of interest). When the InMarket SDK transmits a location that is inside a virtual fence, the app will send a push notification for a particular ad. For example, a consumer who is within 200 meters of a pharmacy might see an ad for toothpaste, cold medicine, or some other product sold at that location.

50.    InMarket also makes its advertising audience segments available on real-time bidding platforms. An advertiser using one of these platforms can select an advertising audience, and identify the amount that it is willing to pay (that is, its bid) each time its ad appears on a mobile device that is a part of that audience.  The advertiser's ad will appear on a particular device if it has the highest bid for that device. InMarket receives some revenue each time an advertiser uses one of its audiences in this process.

51.    Before an app can access a mobile device's location data, the mobile device user must grant access in a system prompt generated by the device's operating system. Despite collecting vast amounts of consumer location and other data for consumer advertising and targeting purposes, InMarket does not fully disclose such collection and use in the system prompts seeking a user's consent to location collection or in-app screens that precede the prompt. InMarket fails to obtain informed consent in the apps it owns and operates, and also fails to verify that the third-party apps which incorporate InMarket's SDK obtain informed consumer consent.

CLASS ACTION COMPLAINT

**C.    InMarket Creates Specific Audience Segments for Targeted Advertising Based on Sensitive Location Data.**

52.    After collecting sensitive precise location data about consumers' daily movements, InMarket retains that information longer than reasonably necessary to accomplish the purpose for which that information was collected and thereby exposes consumers to significant unnecessary risk. Specifically, InMarket has retained consumer location data for five years prior to deletion.

53.    This unreasonably long retention period—far longer than is necessary to accomplish InMarket's stated purpose for collection (to allow a consumer to earn shopping points or make shopping lists)—significantly increases the risk that this sensitive data could be disclosed, misused, and linked back to the consumer, thereby exposing sensitive information about that consumer's life.

54.    InMarket's comprehensive collection and long-term retention of location data subjects consumers to a likelihood of substantial injury through the exposure of their re-identified location.

55.    InMarket touts its commitment to data privacy, claiming on a page on their website titled "Ethics Principles" that "InMarket is committed to serving its clients in a responsible way that 'does no harm.' We provide transparency about our data practices and respect the choices individuals make about their personal data."[5]

56.    InMarket listed, as part of their "Ethics Principles" that they "do not target vulnerable communities with harmful messages" and "do not use sensitive location visit data in our products. (For example, we suppress and delete data from sexual and reproductive healthcare providers.)"

57.    In 2019, the CEO of InMarket, Todd DiPaola stated the focus of the company in following words: "The InMarket platform is built with accuracy and actionability as its core focus. Whether it's delivering growth for our brand partners or closing the loop on sales at real-world businesses, accuracy is absolutely critical."[6]

58.    InMarket utilized strategic acquisitions to enhance its consumer reach and grow its sensitive location database.

---

[5] InMarket, *Ethics Principles*, https://inmarket.com/ethics-principles/ (last visited Feb. 5, 2024)

[6] https://www.prnewswire.com/news-releases/the-path-to-purchase-institute-adds-inmarket-loyalty-data-to-its-retailer-profiles-300870631.html (last visited Feb. 5, 2024)

CLASS ACTION COMPLAINT

59.     In an interview published on Martech Cube on June 20, 2023, Michael Della Penna, the Chief Strategy Officer of InMarket, emphasized the role acquisitions has played in InMarket's expansion of its consumer database. "Our acquisitions over the last few years have enhanced out capabilities and platforms for consumers, brands, and marketers. This strategy has included the expansion of our owned and operated apps including the acquisition of shopping apps that enable consumers to plan, save and organize around their shopping trips. The acquisition of consumer apps Out of Milk, a consumer list and shopping app, and KeyRing, a leading loyalty app, specifically enhanced our consumer app offerings, including List Ease and Checkpoints, which were launched in the early days of InMarket. Subsequent acquisitions including ThinkNear and NinthDecimal further enhanced our close-loop marketing offerings by providing us with a DSP platform Geolink, a proprietary audience offering, GeoTypes which combines various attributes to better understand what motivates consumers or why they shop, and an omnichannel attribution platform to better understand key KPI like visitation and purchase lift associated with a consumer seeing an add."[7]

60.     Despite these assurances and claims, InMarket made expansion of its location database through its SDK on third-party apps a central component of its business model.

61.     As a result of the events detailed herein, Plaintiff and Class members suffered harm and loss of privacy, and will continue to suffer future harm, resulting from Defendant's unlawful data collection practices, including but not limited to: invasion of privacy; loss of privacy; loss of control over personal information; loss of value and loss of possession and privacy of Personal Information; and other harm resulting from the unauthorized access to Personal Information.

62.     As a result of Defendant's unlawful data collection practices, Plaintiff's and Class members' privacy has been invaded and their Personal Information is now accessible to unauthorized third-parties that may utilize this information to Plaintiff's and Class members' detriment.

---

[7] https://www.martechcube.com/martech-interview-with-michael-della-penna-cso-of-inmarket/ (last visited Feb. 5, 2024)

**CLASS ALLEGATIONS**

63.     Plaintiff brings this action on behalf of himself and the following Classes pursuant to Federal Rule of Civil Procedure 2:

> **Nationwide Class**
>
> All residents of the United States whose Personal Information was collected by Defendant without their informed consent.
>
> **California Class**
>
> All residents of California whose Personal Information was collected by Defendant without their informed consent.

64.     Excluded from the Classes are Defendant and their affiliates, officers, directors, assigns, successors, and the Judge(s) assigned to this case.

65.     **Numerosity**: While the precise number of Class members has not yet been determined, members of the Classes are so numerous that their individual joinder is impracticable, as the proposed Classes appear to potentially include millions of members who are geographically dispersed.

66.     **Typicality**: Plaintiff's claims are typical of Class members' claims. Plaintiff and all Class members were injured through Defendant's uniform misconduct, and Plaintiff's claims are identical to the claims of the Class members they seek to represent. Accordingly, Plaintiff's claims are typical of Class members' claims.

67.     **Adequacy**: Plaintiff's interests are aligned with the Classes he seeks to represent, and Plaintiff has retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged data privacy violations. Plaintiff and undersigned counsel intend to prosecute this action vigorously. The Classes' interests are well-represented by Plaintiff and undersigned counsel.

68.     **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class members' claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class members individually to effectively redress Defendant's wrongdoing. Even if Class members could

CLASS ACTION COMPLAINT

afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

69.   **Commonality and Predominance:** The following questions common to all Class members predominate over any potential questions affecting individual Class members:

- whether Defendant engaged in the wrongful conduct alleged herein;
- whether Defendant's collection, storage, distribution, and/or use of Plaintiff's and Class members' Personal Information violated privacy rights and invaded Plaintiff's and Class members' privacy; and
- whether Plaintiff and Class members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

70.   Given that Defendant engaged in a common course of conduct as to Plaintiff and the Classes, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

## CAUSES OF ACTION
### COUNT I
**Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, et. seq.**
**(On Behalf of Plaintiff and the Nationwide Class)**

71.   Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

72.   The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents any wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

73.   The Wiretap Act protects both the sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

74.     InMarket's actions in intercepting and tracking user communications between third-party apps and their users was intentional as it was part of InMarket's scheme to expand its location database as described in detail above.

75.     InMarket's interception of Internet communications that Plaintiff was sending and receiving on their third-party apps (i.e., the geolocation data) was done contemporaneously with the Plaintiff's sending and receipt of those communications.

76.     The geolocation data intercepted by InMarket included the "contents" of electronic communications made from Plaintiff to third-party apps other than InMarket, including geolocation data which Plaintiff sent to those third-party apps in order to receive communications back from those third-party apps. Importantly, Plaintiff is not simply opening a mobile application but communicating to that application what his location is and how his location has changed in order to receive notices or other information from those applications based on the location data sent.

77.     The communications between Plaintiff and the third-party apps, which InMarket intercepted without authorization, were "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

78.     The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

- The InMarket SDK Defendant used to intercept Plaintiff's communications with third-party apps;

- Plaintiff's third-party mobile applications;

- Plaintiff's computing devices; and

- The plan InMarket carried out to effectuate its tracking and interception of the Plaintiff's communications with third-party apps.

79.     InMarket was not an authorized party to the communication because the Plaintiff was unaware of InMarket SDK and its interception and collection of the communications between the Plaintiff and third-party apps other than InMarket.

80.     Plaintiff did not consent to InMarket's continued collection, usage, and/or sharing of

CLASS ACTION COMPLAINT

sensitive geolocation data, and thus never consented to InMarket's interception of their communications with third-party applications.

81.    After intercepting the communications, InMarket then used or shared the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a).

82.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages to Plaintiff; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future, and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT II**
**Violation of California Wiretapping Act**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

83.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

84.    Plaintiff brings this claim individually and on behalf of the California Subclass.

85.    At all relevant times, there was in full force and effect the California Wiretapping Act, Cal. Penal Code § 631.

86.    The California legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, including the Wiretapping Act, "to protect the right of privacy" of residents of California.  Cal. Penal Code § 630.

87.    The California legislature was motivated to enact CIPA by a concern that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.*

88.    The California Wiretapping Act prohibits:

"any person [from using] any machine, instrument, [] contrivance, or in any other manner … [from making] any unauthorized connection, whether physically, electronically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic

communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

89.    Plaintiff's and California Subclass Members' specific user input events and choices on their mobile devices that are tracked by Defendant's SDK communicates the user's affirmative actions, such as clicking a link, installing an app, selecting an option, or relaying a response, and constitute communications within the scope of the Wiretapping Act.

90.    Plaintiff and California Subclass Members are residents of California, and used their smartphones within California. As such, Defendant intercepts, reads, or attempts to read Plaintiff's and Class members' data, communications, and personal information in California.

91.    Defendant intercepts Plaintiff's and California Subclass Members' communications while they are in transit to and from Plaintiff's and California Subclass Members' smartphones and the apps, app developers, and cellphone towers; Defendant transmits a copy of Plaintiff's and California Subclass Members' communications to itself. Defendant uses or shares the contents of the communications to improve its audience segmentation capabilities and generate more profits.

92.    Neither Defendant nor any other person informed Plaintiff and California Subclass members that Defendant was intercepting and transmitting Plaintiff's private communications. Plaintiff and California Subclass Members did not know Defendant was intercepting and recording their communications, as such they could not and did not consent for their communications to be intercepted by Defendant and thereafter transmitted to others.

93.    InMarket's SDK constitutes a machine, instrument, contrivance or other manner to track and intercept Plaintiff's and California Subclass members' communications while they are using their smartphones.

94.    Defendant uses and attempts to use or communicate the meaning of Plaintiff's and California Subclass members' communications by ascertaining their personal information, including

CLASS ACTION COMPLAINT

their geolocation and places that they have visited, in order to profit from Plaintiff's and California Subclass members' personal information by transacting with third parties.

95.     At all relevant times to this complaint, Defendant intercepted and recorded components of Plaintiff's and the putative California Subclass' private telephone communications and transmissions when InMarket SDK had access to Plaintiff and other California Subclass Members' devices within the State of California.

96.     At all relevant times to this complaint, Plaintiff and other California Subclass Members did not know Defendant was engaging in such interception and recording and therefore could not provide consent to have any part of their communications intercepted and collected by Defendant and thereafter shared with others.

97.     At the inception of Defendant's illegal interception and storage of Plaintiff's and California Subclass Members' Personal Information, including geolocation data, Defendant never advised Plaintiff or the other California Subclass Members that any part of this sensitive personal data would be intercepted, collected, and shared with third parties.

98.     Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.

99.     Defendant's use of its SDK is both a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

100.    At all relevant times, by using Defendant's SDK as well as tracking Plaintiff's and California Subclass Members' geolocation, Defendant intentionally taped, electrically or otherwise, the lines of internet communication between Plaintiff and California Subclass Members on the one hand, and the specific sites and locations Plaintiff and California Subclass Members visited on the other.

101.    At all relevant times, by using Defendant's geolocation tracking software technology, Defendant willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and California Subclass Members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

CLASS ACTION COMPLAINT

102.     Plaintiff and California Subclass Members did not consent to any of Defendant's actions in implementing these wiretaps within its geolocation tracking software. Nor have Plaintiff or California Subclass Members consented to Defendant's intentional access, interception, reading, learning, recording, and collection of Plaintiff and California Subclass Members' electronic communications.

103.     Plaintiff's and the California Subclass Members' devices of which Defendant accessed through its unauthorized actions included their computers, smart phones, and tables and/or other electronic computing devices.

104.     Defendant violated Cal. Penal Code § 631 by knowingly accessing and without permission accessing Plaintiff and California Subclass Members' devices in order to obtain their personal information, including their device and location data and personal communications with others, and in order for Defendant to share that data with third parties, in violation of Plaintiff's and California Subclass Members' reasonable expectations of privacy in their devices and data.

105.     Defendant violated Cal. Penal Code § 631 by knowingly and without permission intercepting, wiretapping, accessing, taking and using Plaintiff's and the California Subclass Members' Personal Information and personal communications with others.

106.     As a direct and proximate result of Defendant's violation of the Wiretapping Act, Plaintiff and California Subclass Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

107.     Defendant was unjustly enriched by its violation of the Wiretapping Act.

Pursuant to California Penal Code Section 637.2, Plaintiff and California Subclass members have been injured by Defendant's violation of the Wiretapping Act, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

**COUNT III**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the California Subclass)**

108.     Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

109.     Plaintiff brings this claim individually and on behalf of the California Subclass.

- 17 -

CLASS ACTION COMPLAINT

110.    The California Constitution recognizes the right to privacy inherent in all residents of the State and creates a private right of action against private entities that invade that right.

111.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

112.    The right to privacy was added to the California Constitution in 1972, through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was designed to codify the right to privacy, protecting individuals from invasions of privacy from both the government and private entities alike: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., Proposed Stats. And Amends. To Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; *see also Hill v. Colorado*, 530 U.S. 703, 716 (2000) (the right to privacy includes right to be free in one's home from unwanted communication); *Hill v. National Collegiate Athletic Assn.* (1994), 7 Cal.4th 1, 81, (Mosk, J., dissenting).

113.    Plaintiff and the California Subclass members have a legally protected privacy interest, as recognized by the California Constitution, CIPA, common law and the 4th Amendment to the United States Constitution.

114.    Plaintiff and California Subclass members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiff and California Subclass members were not aware and could not have reasonably expected that an unknown third party would embed its SDK on their mobile devices and intercept, collect, and/or use their Personal Information, including geolocation data, and share that information with other parties.

115.    Defendant's conduct violates, at a minimum:

- 18 -

CLASS ACTION COMPLAINT

a) The right to privacy in data, communications and personal information contained on personal devices;

b) The California Constitution, Article I, Section 1;

c) The California Wiretapping Act;

d) The California Invasion of Privacy Act; and

e) The California Computer Data Access and Fraud Act.

116.    Defendant's conduct in secretly intercepting and collecting Plaintiff's and California Subclass members' Personal Information, including sensitive geolocation data, is an egregious breach of social norms and is highly offensive to a reasonable person.

117.    Defendant's conduct in analyzing, using, and sharing with third parties the Personal Information and communications that Defendant intercepted and took from Plaintiff's and California Subclass members is an egregious breach of societal norms and is highly offensive to a reasonable person, and violates Plaintiff's and California Subclass members' reasonable expectations of privacy.

118.    Plaintiff and California Subclass members did not consent for Defendant to track, collect, use, or share their Personal Information.

119.    As a direct and proximate result of Defendant's invasion of their privacy, Plaintiff and California Subclass members were injured and suffered damages. Plaintiff and California Subclass members are entitled to equitable relief and just compensation in an amount to be determined at trial.

120.    Defendant was unjustly enriched as a result of its invasion of Plaintiff's and California Subclass members' privacy.

**COUNT IV**
**Violation of the California Computer Data Access and Fraud Act**
**Cal. Penal Code § 502**
**(On Behalf of Plaintiff and the California Subclass)**

121.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

122.    Plaintiff brings this claim individually and on behalf of the California Subclass.

123.    The California legislature enacted the CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals … from tampering, interference, damage, and

unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code §502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of … unauthorized access to computers, computer systems, and computer data." *Id.*

124. Plaintiff's and California Subclass members' smartphones constitute "computers" within the scope of the CDAFA.

125. Defendant violated the following sections of the CDAFA:

(a) Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission … use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

(b) section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

(c) Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

126. Defendant knowingly accessed Plaintiff's and California Subclass members' smartphones without their permission by including within the SDK, that Defendant provides to developers, software that intercepts and transmits Personal Information concerning Plaintiff and California Subclass members.

127. Defendant used Personal Information that it intercepted and took from Plaintiff's and California Subclass members' smartphones to wrongfully and unjustly enrich itself at the expense of Plaintiff and California Subclass members.

128. Defendant took, copied, intercepted, and made use of data, communications, and personal information from Plaintiff's and California Subclass members' smartphones.

129. Defendant knowingly and without Plaintiff's and California Subclass members' permission accessed or caused to be accessed their smartphones by installing without Plaintiff's and

CLASS ACTION COMPLAINT

California Subclass members' informed consent software that intercepts and/or takes data, communications and personal information concerning Plaintiff and California Subclass members.

130.    Plaintiff and California Subclass members are residents of California, and used their smartphones in California. Defendant accessed or caused to be accessed Plaintiff's and California Subclass members' data, communications, and personal information from California.

131.    Defendant was unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and California Subclass members' data, communications, and personal information without their permission, and using it for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

132.    As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and California Subclass Members suffered damages.

133.    Pursuant to CDAFA Section 502(e)(1), Plaintiff and California Subclass Members seek compensatory, injunctive and equitable relief in an amount to be determined at trial.

134.    Pursuant to CDAFA Section 502(e)(2), Plaintiff and California Subclass Members seek an award of reasonable attorney's fees and costs.

135.    Pursuant to CDAFA Section 502(e)(4), Plaintiff and California Subclass Members seek punitive or exemplary damages for Defendant's willful violations of the CDAFA.

**COUNT V**
**Violations of California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200**
**(On Behalf of Plaintiff and the California Subclass)**

136.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

137.    Plaintiff brings this claim individually and on behalf of the California Subclass.

138.    At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, *unfair*, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."  Cal. Bus. & Prof. Code § 17200 (emphasis added).

139.    The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

140.     The harm caused by Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests, other than Defendant's conduct described herein.

141.     As a result of Defendant's violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration, e.g. access to their Private. The unauthorized access to Plaintiff's and Class members' private and personal data also has diminished the value of that information.

**Unlawful Prong**

142.     In the course of their business, Defendant repeatedly and regularly engaged in unlawful acts or practices that imposed a serious harm on consumers, including Plaintiff and California Subclass members.

143.     Defendant's acts and practices are unlawful because Defendant violated, and continues to violate:

            b.          The Constitution of California, Article I, Section 1;

            c.          The California Wiretapping Act;

            d.          The Federal Wiretap Act;

            e.          The California Computer Data Access and Fraud Act;

            f.          The California Invasion of Privacy Act; and

            g.          Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45.

144.     As a direct and proximate result of Defendant's unlawful practices, Plaintiff and California Subclass members were injured and suffered damages, a loss of privacy, and loss of value of their personal information in an amount to be determined at trial.

145.     Plaintiff seeks to enjoin further unlawful acts or practices by Defendant, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

**Unfair Prong**

146.    Defendant's business acts, practices, and conduct also violate the unfair prong of the UCL because Defendant's surreptitious intercepting, collecting, tracking, using, and sharing of Plaintiff's and California Subclass Members' personal information, including geolocation data, and communications offended public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and other Class members. The gravity of Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests, other than Defendant's conduct described herein.

147.    Defendant also engaged in a number of practices designed to perpetuate the scheme and the stream of revenue it generates. Those practices, which are unfair separately and particularly when taken together, include but are not limited to invasion of Plaintiff's and California Subclass members' privacy; surreptitiously tracking Plaintiff's and California Subclass members' location; surreptitiously accessing Plaintiff's and California Subclass members' cellphones without authorization; surreptitiously obtaining personal data from Plaintiff's and California Subclass members' cellphones; surreptitiously intercepting and recording Plaintiff's and California Subclass members' communications.

148.    Unfair acts under the UCL have been interpreted using three different tests: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided. Defendant's conduct alleged is unfair under all of these tests.

149.    As a direct and proximate result of Defendant's unfair practices, Plaintiff and California Subclass Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

150.    Plaintiff seeks to enjoin further unfair acts or practices by Defendant, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Profession Code §17200.

## COUNT VI
### Use of a Pen Register or Trap and Trace Device
### Cal. Penal Code § 638.51
### (On Behalf of Plaintiff and the California Subclass)

151.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

152.    Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

153.    California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

154.    California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

155.    InMarket's SDK constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff's and California Subclass Members' geolocation data and personal information—from the electronic communications transmitted by their smartphones.

156.    Defendant was not authorized by any court order to use a pen register to track Plaintiff's and California Subclass members' location data and personal information.

157.    As a direct and proximate result of Defendant's conduct, Plaintiff and California Subclass Members suffered losses and were damages in an amount to be determined at trial.

## COUNT VII
### Unjust Enrichment or Restitution
### (On Behalf of Plaintiff and the Nationwide Class)

158.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

159.    Plaintiff brings this claim individually and on behalf of the Class.

160.    Plaintiff and members of the Class conferred a benefit on Defendant through the use and dissemination of Plaintiff's and Class members' personal information, geolocation data, and communications.

161.    Defendant received and is in possession of Plaintiff's and Class members' personal information, geolocation data, and communications, which Defendant used and disseminated for its own monetary benefit.

162.    It is unjust under the circumstances for Defendant to retain the benefit conferred by Plaintiff and Class members without compensating them.

## **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of the Classes, by and through undersigned counsel, respectfully requests that the Court grant the following relief:

A.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as class representative and undersigned counsel as class counsel;

B.    Award Plaintiff and Class members actual and statutory damages to the maximum extent allowable;

D.    Award Plaintiff and Class members pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Award Plaintiff and Class members reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Award Plaintiff and Class members such other favorable relief as allowable under law or at equity.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  February 5, 2024                     Respectfully submitted,

                                             */s/ Tina Wolfson*
                                             TINA WOLFSON (SBN 174806)
                                             *twolfson@ahdootwolfson.com*
                                             ROBERT AHDOOT (SBN 172098)

*rahdoot@ahdootwolfson.com*
THEODORE MAYA (SBN 223242)
*tmaya@ahdootwolfson.com*
DEBORAH DE VILLA (SBN 312564)
*ddevilla@ahdootwolfson.com*
SARPER UNAL (SBN 341739)
*sunal@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  310.474.9111
Facsimile:   310.474.8585

*Attorneys for Plaintiff and the Proposed Classes*